Vincent A. Lupiano, J.
This non jury trial involves the death of the infant Robertito Gutierrez, who, on August 10, 1956, at about 7:00 p.m., fell or jumped from the window of the third-floor community bathroom to the courtyard of the premises known as 254 West 98th Street, Manhattan. Bizarre circumstances present themselves upon the record. In a “ big room ”, for a time, two families, aggregating four adults and nine children, made this piece of real estate their home. The deceased infant was one of them. The Rojas family was the first to occupy this “ apartment ”, then moved out, leaving Rosa Quinones and her family, which included “her husband ”, Alfonso Lopez, Jr., Robertito and three other small children. It is evidentially significant to note that the bathroom in question was used by seven families who occupied one-room ‘ ‘ apartments ’ ’ on the same floor.
Rosa Quinones, as administratrix, contends that, on the fateful evening, after Robertito had closed the bathroom door behind him, it became jammed so tight and fast that, later, he *730 could not open it. The mother, attracted by his cries, hastened from the community kitchen to the bathroom door; there, she and Lopez directed their efforts to push it open; inside the bathroom, alone, the boy kept on crying, “ Let me out ” — hysterical emanations stimulated by an unknown fear. Lor 15 minutes they tried to assure Robertito there was nothing to fear; yet the door would not open and was not to be opened until Detective Lynch arrived upon the scene, some time later. Before he arrived, however, the frantic mother and Lopez heard a final cry, then silence; Robertito’s inert figure, with ‘ ‘ long hair ” and a lollypop in his mouth, was sprawled upon the courtyard pavement below. The boy had fallen or jumped from the window. Mainly, this is how the plaintiff says her son met his death.
Details were furnished to the end that the bathroom door was knowingly defectively maintained, and such defect, in some manner, caused the door to jam, so that the fierce poundings of two adults could not even budge it. The plaintiff’s proof carefully disavowed the possibility that resistance was caused by some fastening device within the bathroom. As a matter of fact, plaintiff contends that the lock, latch and bolt were either missing or unworkable and that intervention of human hand and fastening device did not cause the door to jam as it did. The bill of particulars alleges defendant was negligent in failing to have the “ door lock in a good and safe operating condition; * * * permitting and installing a lock which was defective and could not readily open * * * and allowing the window of the community bathroom to remain open * * * knowing there were many infants in the said premises. ’ ’
Assuming plaintiff’s proof, her theory advanced relative thereto, stripped of professional verbiage, would make the defendant landlord herein civilly liable for keeping a window open, and a bathroom door which was used in common with seven other families in such a state of disrepair, that death, as it allegedly occurred, must be laid at defendant’s doorstep. But the law is less emotional, more pronounced, and before the ambit of liability is drawn, death must answer as a direct and proximate consequence of negligence, and the ultimate complained about must be reasonably foreseen in its happening. As part of the happening of the accident here, the asserted cause and manner in which the door closed (it had never jammed that way before despite the heavy human use put upon it) must also be proved and foreseen; similarly, that when the door jammed and could only be forced with great difficulty, the frightened state *731 of an infant, restrained within, would cause Mm to fall or jump from an opened window. Pausing here, there is no clear proof that the boy either fell accidentally or jumped from the window. Even this nebulous phase makes it difficult to conclude the ultimate and probable consequence with the exactitude and essentiality of casual relationship. The matter, in this posture, is fraught with speculation.
Bult even if the credible proof basically sustains the happening of this unfortunate occurrence as contended by the plaintiff, the defendant could not be held for the infant’s death within the applicable rule of law. Apart from other considerations, the fatal consequence must have arisen in an unbroken and proximate line leading toward the door wMch, granted, was a miserable excuse for its purpose.
Therefore, the ascribed negligence, before becoming actionable, must be viewed and measured in the light of the claimed consequence and the surrounding circumstances; hence, a breach of duty which makes for actionable negligence will not be concluded as such until and unless the harm done could have been foreseen and it was a proximate and direct result of the claimed negligence. Ultimately stated, £< Negligence is to be gauged by the ability of one to anticipate danger. The test of actionable negligence is not what could have been done to have prevented a particular accident, but what a reasonably prudent and. careful person would have done under the circumstances in the discharge of his duty to the injured party. Failure to guard against a remote possibility of accident, or one which could not, in the exercise of ordinary care, be foreseen, does not constitute negligence ” (Lane v. City of Buffalo, 232 App. Div. 334, 338).
The plaintiff, within the concept of the law as stated above, has not sustained the required burden in that essential phase. Furthermore, the record proof, when taken with studied evaluation, turns in a direction other than the one urged by plaintiff, and logical reflection leads to the conclusion that an intervening-hand— that of the unfortunate infant himself — caused the door to stand fast until Detective Lynch came upon the scene, after the accident was over. The door he saw had no knob. As other proof revealed, too, an opening was present where a lock had once been inserted and where doorknobs should have been, both inside and outside. Inside there was a bolt with no aperture for insertion. Immediately above, there was a latch, referred to in the testimony as a ££ hook and eye ”. Most of the times the door remained opened when the bathroom was not in use; to insure privacy, the door could be closed by pushing it within *732 the frame; when, inside, opening required insertion of a finger hol'd within the opening where the knob should have been, then grabbing the bolt with the fingers of the other hand and pulling inward.
Inconsistencies occurred as to whether either latch or bolt was workable. In the last measure of things, it matters not which of these functioned, for tlie testimony of Detective Lynch has given some definitive explanation of what happened inside the bathroom. "When he arrived, this husky policeman pushed the door twice to no avail; then he stood back and kicked it five or six times. The wooden door opened, and in the corner of the 15-foot long and 8-foot wide bathroom he found a ‘ ‘ latch torn from its moorings ”.
This vital evidence convincingly establishes that some device had been fastened from the inside which was the source of the stubborn resistance the door had made. Such deduction is inescapable and is readily acceptable, since no other, satisfactory explanation is given for the extraordinary ‘ ‘ jamming ’ ’ of the door. Proceeding further, it would be on the side of speculation to .say that the fastening occurred automatically; such phenomenon would run counter to the extreme and heavy use (including that of children) the door had been previously put to, without similar incident. The boy, the only human force within the room, must have latched the bathroom door, and his intervening act would be enough to break off the causal connection necessary to make for actionable negligence.
It may be noted that the defendant contended that the infant, who had 11 long hair ”, had sought refuge within the bathroom and had barred himself to prevent his hair from being cut. The mother did admit she made a religious vow that if Robertito’s life was spared she would not cut his hair until he became six yeans old. The vow was made shortly after his birth, when Robertito was stricken with a serious illness. If properly established, this evidence would tend to support the fact that Robertito himself had barred the door and that the attributed hysteria really arose from fear of having his hair out. However, this phase was not sufficiently established and such evidence has not been given lending support to the decision herein, made pursuant to section 440 of the Civil Practice Act. The complaint is dismissed and judgment may be entered in favor of the defendant. Exhibits are available at the Trial Term Part.